UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

   UNITED STATES OF AMERICA

**MEMORANDUM & ORDER**

**08-CR-888 (NGG) (VVP)**

       -against-

   VICTOR ACOSTA BOURNE and MARIA
   ALLEYNE,

                Defendants.
------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

Defendant Victor D'Acosta Bourne ("Bourne") is charged in a superseding indictment

with various crimes stemming from his alleged participation in a Drug Trafficking Organization

("DTO" or the "Bourne Organization"), and Defendant Marie Alleyne ("Alleyne") is charged

with various crimes related to her alleged involvement in money laundering and structuring the

proceeds of the DTO.  (See S-5 Superseding Indictment ("S-5 Indictment") (Docket Entry

# 228).)  The parties have made numerous pretrial motions,[1] and the court heard argument on

several of these motions on August 26, 2011 (see Pretrial Mot. Hearing Tr.) and September 13,

2011 (see Suppression Hearing Tr.).  On September 13, 2011, the court also held a suppression

---

[1]     While the following is not an exhaustive list of the papers filed in support of and in opposition to the
parties' motions addressed herein, all filings cited in this order are listed below in chronological order.  Bourne Mot.
to Compel (Docket Entry # 172); Alleyne Notice of Mot. to Suppress (Docket Entry # 179); Alleyne Affidavit
(Docket Entry # 179-3 Exh. B); Warrant Application (Docket Entry # 179-3 Exh. C); Alleyne Mem. (Docket Entry
# 179-4); Bourne Mot. (Docket Entry # 180); Bourne Compel Letter (Docket Entry # 181); Gov't Opp. to Wiretap
Discovery (Docket Entry # 182); Gov't Opp. Alleyne (Docket Entry # 186); Gov't Mem. Opp. Bourne (Docket
Entry # 187); Def. Letter re Expert (Docket Entry # 204); Gov't 404(b) Mot. (Docket Entry # 205); Bourne Letter re
Pro Se Mot. (Docket Entry # 208); Bourne 404(b) Opp. (Docket Entry # 213); Gov't Opp. re Expert (Docket Entry #
215); Gov't Mot. in Limine (Docket Entry # 219); Alleyne Post-Hearing Letter (Docket Entry # 223); Bourne Post-
Hearing Letter (Docket Entry # 224); Gov't 404(b) Reply (Docket Entry # 226); Gov't Post-Hearing Submission
(Docket Entry # 227); Gov't Opp. to Pro Se Mot. (Docket Entry # 229); Alleyne Opp. to Motion in Limine (Docket
Entry # 230); Bourne Opp. to Mot. in Limine (Docket Entry # 231); Alleyne Response to Gov't Post-Hearing
Submission (Docket Entry # 234).

hearing related to Alleyne's Motion to Suppress. (Suppression Hearing Tr.; Alleyne Notice of Mot. to Suppress (Docket Entry # 179).) As set forth below, the parties' pretrial motions are granted in part and denied in part.

## I. BACKGROUND

The Fifth Superseding Indictment ("S-5 Indictment") charges that Bourne, while employed as a fleet service clerk for American Airlines at John F. Kennedy International Airport ("JFK"), "was the principal leader of a narcotics trafficking organization and continuing criminal enterprise operating in the New York metropolitan area and the Caribbean," (the "Bourne Organization"). (S-5 Indictment ¶ 6.) The Government alleges that between 2000 and 2009, the Bourne Organization smuggled over 150 kilograms of cocaine into the United States from destinations in the Caribbean by hiding it aboard American Airlines flights to JFK. (Id. ¶¶ 8-10.) It further alleges that the Bourne organization distributed cocaine and over 5,000 kilograms of marijuana both domestically and internationally, and that distribution occurred in part through a footwear business in Brooklyn, New York and another business in Barbados. (Id. ¶ 8, 11.) The S-5 Indictment charges that Alleyne conspired with Bourne to structure transactions with financial institutions, and to engage in monetary transactions designed to conceal the proceeds of the Bourne Organization's drug trafficking. (Id. ¶¶ 12-13.)

Bourne is charged with the following crimes: engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848;[2] one count of cocaine importation conspiracy, in violation of 21 U.S.C. §§ 963, 960(a)(1), 960(b)(1)(B)(ii); one count of conspiracy to distribute

---

[2] The alleged continuing series of violations, as defined by 21 U.S.C. § 848(c), include (1) conspiracy to import cocaine, (2) conspiracy to distribute cocaine, (3) cocaine importation, (4) attempted possession of cocaine with intent to distribute, (5) international marijuana distribution conspiracy, (6) attempted international distribution of marijuana, (7) cocaine importation, (8) possession of cocaine with intent to distribute, (9) cocaine importation, (10) possession of cocaine with intent to distribute, (11) cocaine importation, and (12) attempted possession of cocaine. (S-5 Indictment ¶¶ 16-27.)

cocaine, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(ii)(II); four counts of cocaine

importation, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(1)(B)(ii); two counts of

possession of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1),

841(b)(1)(A)(ii)(II); two counts of attempted possession of cocaine with intent to distribute, in

violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii)(II); one count of international marijuana

distribution conspiracy, in violation of 21 U.S.C. §§ 963, 959(c), 960(b)(1)(G); one count of

attempted international marijuana distribution conspiracy, in violation of 21 U.S.C. §§ 963, 959,

960(b)(2)(G); and, one count of conspiracy to distribute marijuana, in violation of 21 U.S.C. §§

846, 841(b)(1)(B)(vii).  Both Bourne and Alleyne are charged with: one count of money

laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and, one count of structuring

conspiracy, in violation of 31 U.S.C. § 5324(d)(2).  Alleyne is charge with six counts of

structuring, in violation of 31 U.S.C. §§ 5324(a)(3), (d)(1).

## II.     DEFENDANTS' PRETRIAL MOTIONS

### A.      Alleyne's Motion to Sever

Alleyne moved to sever the charges against her from those against Bourne.  (Alleyne

Mem. (Docket Entry # 179-4) at 2-5.)  Alleyne argues that she will suffer spillover prejudice

from the evidence introduced against Bourne because whereas she is charged with money

laundering and structuring charges, he faces narcotics trafficking charges.  (Id. at 2-4.)  Alleyne

contends that the jury will not be able to separate out the allegations against her from the

"veritable mountain of evidence having nothing whatever to do with [her] finance type charges,"

and that "the sheer number of conspiracies" charged will confuse the jury.  (Id. at 4.)

At the August 26, 2011 hearing, the court denied Alleyne's Motion to Sever.  (Pretrial

Mot. Hearing Tr. at 28.)  This decision is because the court "should grant a motion for severance

only if there is a serious risk that a joint trial would compromise a specific trial right of the moving defendant or prevent the jury from making a reliable judgment about guilt or innocence." United States v. Miller, 116 F.3d 641, 679 (2d Cir. 1997) (quotation marks omitted); see also Fed. R. Crim. Pro. 14(a) (district court may sever defendants' trials where joinder "appears to prejudice a defendant or the government"). Although cases may arise "in which the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant that a severance is required to prevent unacceptable spillover prejudice," United States v. Spinelli, 352 F.3d 48, 55 (2d Cir. 2003), "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials," United States v. Carson, 702 F.2d 351, 366-67 (2d Cir. 1983).

Here, what Alleyne characterizes as spillover prejudice is actually direct evidence of the money laundering charge against her. The S-5 Indictment charges that Alleyne conspired with Bourne to structure financial transactions and launder the proceeds of Bourne's alleged drug trafficking conspiracy. (S-5 Indictment ¶¶ 55, 57-58.) Because the Government must prove that Alleyne conspired to conceal the proceeds of drug trafficking, see 18 U.S.C. § 1956(a)(1),[3] much of the drug evidence against her coconspirator, Bourne, will be directly admissible against her. See United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993) ("Evidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial."); Spinelli, 352 F.3d at 55 ("Joint trials are often particularly appropriate in

---

[3]     Specifically, the Government must prove, inter alia, that Defendant has conducted a financial transaction with the proceeds of a known unlawful activity with the intent to "promote the carrying on of specified unlawful activity" or to conceal the nature, location, source, ownership or control of the proceeds of the activity. 18 U.S.C. § 1956(a)(1).

circumstances where the defendants are charged with participating in the same criminal conspiracy."). Additionally, even if some evidence admissible against Bourne would be inadmissible against Alleyne, Alleyne has not identified any specific evidence that will cause her substantial prejudice if it is introduced against Bourne at trial. Carson, 702 F.2d at 367 ("[T]he fact that evidence may be admissible against one defendant but not another does not necessarily require a severance."); Spinelli, 352 F.3d at 55 (holding that a defendant must demonstrate that she suffered substantial prejudice from the introduction of evidence against a co-defendant that would be inadmissible against her). Moreover, the court will be able to remedy any spillover prejudice by instructing the jury to consider the charges and evidence against each defendant separately. See Miller, 116 F.3d at 679. Alleyne may supplement her proposed jury instructions with an instruction to this effect.

**B.  Alleyne's Motion to Suppress Evidence Obtained From Her Residence**

Alleyne moves to suppress the fruits of the search of her residence at 848 Linden Boulevard, Brooklyn, New York, which occurred on the morning of October 14, 2010.[4] (Alleyne Mem. at 6-10.) Alleyne contends that, after arresting her outside of her home, agents conducted an unlawful warrantless search of her residence, and relied on information obtained through that search to later obtain a search warrant. (Id.) In support of her position, Alleyne submits a sworn affidavit, which describes the events surrounding the search as follows:

> 3. On October 14, 2010, at approximately 8:00 a.m., I returned to my home after taking my daughter Ashlyn to school. Law enforcement agents were waiting for me outside my home. One of the agents pulled me by the arm and insisted on entering my home without my permission or consent. Once inside, the

---

[4]      Bourne seeks to join in Alleyne's motion to suppress, arguing that he also has standing to challenge the search. (Bourne Mot. (Docket Entry # 180) at 2; Bourne Post-Hearing Letter (Docket Entry # 224).) Bourne has not testified or submitted a sworn affidavit, but relies on the suppression hearing testimony elicited from Government witnesses in support of his position. Because Bourne's challenge is premised on the same argument as Alleyne's, and because the court finds that the search of Alleyne's residence complies with the Fourth Amendment, the court need not resolve the standing issue here. Bourne's motion to suppress, like Alleyne's, is denied.

agents started searching for evidence. During their search the agents read through my records and documents before labeling some of them and then placing them in a plastic bag. When I protested to the agents that they did not have a warrant to search my home and take the documents, one of them told me that they didn't need a search warrant because the documents were in "plain view."

    4.   Several hours after taking the documents from my home without a search warrant, the agents returned to my home with a search warrant and took other items including additional records and documents.

(Alleyne Affidavit (Docket Entry # 179-3 Exh. B) at ¶¶ 3-4.)

The Government opposes this motion, arguing (1) that Alleyne consented to the agents accompanying her into her home after her arrest, and (2) that once the agents were inside the residence, the incriminating evidence that formed the basis for their warrant application was in plain view.[5] (Gov't Opp. Alleyne (Docket Entry # 186).) On September 13, 2011, the court held a suppression hearing, at which two agents involved in Alleyne's arrest and in the search of her home testified. (See Suppression Hearing Tr.) The court found the testimony of both agents forthright and credible, and credits their testimony as set forth below.

    1.    Facts

At the suppression hearing, the court heard the testimony of Agents Jerry DiNapoli and Andrew Goldstein of Homeland Security Investigations ("HSI"). (See Suppression Hearing Tr.) Agent DiNapoli provided testimony relevant to the issue of Alleyne's consent to enter her home. Agent Goldstein provided testimony about to evidence that was recovered from within Alleyne's residence, which formed the basis for the Government's subsequent search warrant application.

---

[5]    In the warrant application, Special Agent Robert W. Buonaspina of the Department of Homeland Security stated that several items "in plain view" gave rise to probable cause to believe Alleyne's residence contained fruits, instrumentalities, and evidence of illegal activity. (Warrant Application (Docket Entry # 179-3 Exh. C) ¶ 20.) Specifically, Agent Buonaspina states that agents noticed items including "multiple cellular phones and check books that were not in Alleyne's names, as well as numerous bankers boxes and what appeared to be financial documents." (Id. ¶ 16.) Agents also seized three documents, which the application also describes as in plain view: a lease for a rental property that listed Alleyne as the owner, a document reflecting the international travel of a cooperating government witness, and an envelope with handwritten notes including the words "Customs" and "Enforcement" and a Barbadian telephone number. (Id. ¶¶ 17-19.)

Agent DiNapoli was the team leader involved Alleyne's arrest.  (Id. at 7 (stating that six to eight agents were assigned to the arrest).)  He arrived at 848 Linden Boulevard at approximately 7:00 a.m. on the day of the arrest.  (Id. at 8-9.)  He watched Alleyne leave her home (apparently to take her daughter to school) and return at approximately 10:00 a.m.  (Id. at 9, 11.)  When Alleyne returned, she backed her car into her driveway and Agent DiNapoli approached the vehicle.  (Id. 11-13.)  Alleyne did not respond initially, and remained in the vehicle while she spoke on her cell phone.  (Id. at 14.)  When Agent DiNaopli knocked on the driver's side window and informed Alleyne that he had a warrant for her arrest, she exited the vehicle.  (Id. at 14-15.)  Standing outside, a few feet from the car, Agent DiNapoli told Alleyne that she was under arrest and explained what would happen to her next.  (Id.at 15-17.)  He did not handcuff Alleyne or physically touch her at any time.  (Id. at 15, 18.)  Agent DiNapoli was the only agent to speak to Alleyne. (Id.)  He testified that her demeanor was calm throughout their conversation.  (Id.)

Agent DiNapoli described his interaction with Alleyne, prior to the agents' entrance into her residence, as follows:

> A: I told her that she would be taken to our office where we would ask her a number of questions, like her full name, social security number, all of the information we need for our paperwork, and that later that day she would then be taken to the Eastern District of New York for her arraignment.
>
> Q: What was her response?
>
> A: She was just like okay.
>
> Q: What if anything happened next?
>
> A: I noticed that she was wearing a lot of jewelry and that she had a medium size to large woman's handbag.  I asked her if she would want to come with us now and take all of that stuff with her, or if she would rather go in the house and drop the stuff off and leave it there.

. . .

Q:  Now, why did you give her this option of—

A:  I didn't want to be responsible for all of the stuff that she had. She had a lot of gold—what appeared to me to be gold.  I didn't know what was inside the bag. It seemed like a lot of extra stuff we didn't need to deal with that day.  So it would be better off to let the person drop it off, if possible.

Q:  Why was that?

A:  So we weren't accountable.  We wouldn't lose anything.  If it doesn't have any evidentiary value, we don't need it.

Q:  And prior arrests you presented this option before.  Why is that?

A:  For the same reasons.  I didn't want to be accountable for other people's property.

Q:  [When] presented with the option of leaving her things or going right then, what was her response?

A:  She said—she asked me if you want to go in my house, is what she said to me, and I told her, I said, that's totally up to you.  You can go with me now or go upstairs with you, meaning the other agents involved in the arrest, because you are under arrest and we have to escort you.

Q:  And what was her response after you said that to her?

A:  She thought about it for a couple of seconds and she agreed.

Q:  Now, that option that you just stated, how many times did you present this option to her?

A:  Once.

Q:  Did she ever tell you you can't enter her house?

A:  No.

. . .

Q:  And what happened after this was explained to her?

A:  Well, she thought about it and she agreed to go up.  She said she wanted to put her stuff away and she agreed to let us go in.

(<u>Id.</u> at 16-18.)  Agent DiNapoli further testified, that Alleyne appeared to understand

what he was saying, that the conversation was calm and polite, that he did not threaten

Alleyne, and that she did not ask any additional questions or voice concerns about

entering her home.  (<u>Id.</u> at 18-19, 42-43.)

Following this conversation, Alleyne entered the house accompanied by several

agents.  (<u>Id.</u> at 19.)  She unlocked the door using her own key, and two agents remained

on the lower floor while one to two others accompanied Alleyne upstairs to her bedroom.

(<u>Id.</u>)

Agent Goldstein, the case agent then-assigned to Alleyne's case, was one of the officers

who entered her residence following her arrest.  (<u>Id.</u> at 55.)  He remained on the lower floor

while other agents accompanied Alleyne upstairs.  Agent Goldstein testified that when he entered

Alleyne's residence, he saw the following:

> A:  When you walk into the apartment, it is essentially the dining room.  Right in
> front of me almost immediately was a large dining room table which was covered
> with documents, checkbooks—let's see, papers, correspondence that appeared to
> be from banks.  On the other side of the table was a large I guess a china cabinet.
> Again there were documents on that.  To the left as you entered the apartment,
> you have to turn left, and there's a computer hutch. Next to that were bankers'
> boxes. To the left—actually, if you go straight through the dining room, the
> kitchen is on the other side.  I did not enter the kitchen.
>
> Behind you is what would be the living room of the apartment.  Again in
> this area I noticed that there were multiple boxes that appeared to be filled with
> documents.  There were multiple cell phones lying about. There were check
> registers that were closed. Again I saw more documents that appeared to—
> correspondence that appeared to be from ba[nk]s.

(<u>Id.</u> at 55-56.)  Agent Goldstein had been involved in the investigation of Alleyne and Bourne

since 2008, and was familiar with the case. (<u>Id.</u> at 46-47.)  He testified that he believed that what

he observed in Alleyne's apartment was consistent with illegal activity:

A: In my experience with narcotics investigations, people that are involved in narcotics and money laundering routinely have multiple cell phones and multiple bank accounts in which to conduct business in order to hide their profits or their activities from observation.

Agent Goldstein took photographs of Alleyne's home as he observed it. (Id. at 57; Gov't Exh. 2, 3, 4, 5, 6.) He testified that the photographs accurately represent the room as he first saw it, and that he took the photographs before picking up or moving any item. (Suppression Hearing Tr. at 59, 73, 88.) Agent Goldstein also seized three documents from Alleyne's home. (Suppression Hearing Tr. at 58-59; Gov't Exh. 9-12.) As shown in the photographs Agent Goldstein took, these documents were legible as they lay. (See Gov't Exh. 2, 3, 4, 5, 6.) Agent Goldstein testified that these items were immediately visible, and that he was able to comprehend their significance without touching or manipulating them. (Suppression Hearing Tr. at 93.) The Government relied on this information, including the three documents Agent Goldstein seized, in successfully applying for a search warrant for Alleyne's home. (See id. at 74; Warrant Application (Docket Entry # 179-3 Exh. C).)

At the suppression hearing, Defendants provided no witnesses to rebut any of the agents' testimony, relying instead solely on Alleyne's affidavit.

2. Consent

Although a warrantless search or seizure is ordinarily prohibited under the Fourth Amendment, such a search or seizure is permissible where "the authorities have obtained the voluntary consent of a person authorized to grant such consent." United States v. Elliott, 50 F.3d 180, 185 (2d Cir. 1995).

Voluntariness is determined by reference to the totality of all the circumstances. While more than mere acquiescence in a show of authority is necessary to establish the voluntariness of a consent, the fact that a person is in custody or has been subjected to a display of force does not automatically preclude a finding of voluntariness.

United States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006) (quotation marks and internal citations omitted). Defendants "can, and often do, consent to a search even when it must be clear to them that incriminating evidence will be disclosed." United States v. Price, 599 F.2d 494, 503 (2d Cir. 1979.) Where it claims that a defendant consented, the Government "bears the burden of proving by a preponderance of the evidence that the consent was voluntary." Snype, 441 F.3d at 131.

Here, the Government has met its burden of proving that the agents initially entered Alleyne's residence with her voluntary consent. Agent DiNapoli's credible testimony establishes that he presented Alleyne with a choice of whether or not to enter her home accompanied by agents. Alleyne had a brief, polite conversation with one agent while standing outside of her home in broad daylight. Alleyne was not handcuffed or threatened, and—in light of Agent DiNapoli's testimony to the contrary—the court does not credit Alleyne's contention that an agent "pulled" her by the arm. Contrary to defense counsel's contention, the fact that Alleyne may have been uncooperative in other stages of her arrest does not undermine her consent at this point. (See Alleyne Post-Hearing Letter (Docket Entry # 223).) Agent DiNapoli provided Alleyne with two options, and she opted to enter her home and set down her belongings. She informed the agent of this decision, produced keys to her residence, and unlocked the doors for herself and the agents. In light of the totality of the circumstances, the court finds that Alleyne gave consent to enter her home voluntarily.

3.    Plain View

The Government argues that the agents' warrantless seizure of documents from within Alleyne's home was justified under the plain view doctrine. Alleyne claims that the incriminating evidence agents found during their entrance to her home were not in plain view.

(See Alleyne Mem. at 6-10; Alleyne Response to Gov't Post-Hearing Submission (Docket Entry # 234).)

> Under [the plain view] doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant. If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object— i.e., if 'its incriminating character [is not] immediately apparent,'—the plain-view doctrine cannot justify its seizure.

Minnesota v. Dickerson, 508 U.S. 366, 375 (1993) (quoting Horton v. California, 496 U.S. 128, 136 (1990)).

Here, Agent Goldstein's testimony—in conjunction with the photographs that he took of the interior of Alleyne's residence—provides a sufficient basis for finding that the three seized documents, and other evidence referenced in the search warrant application, were in plain view. Agent Goldstein credibly testified that the documents were legible as they lay, and that he did not touch or manipulate items within Alleyne's home. The incriminating nature of these documents were immediately apparent to him, based on his law enforcement experience and his knowledge of this case. There is no evidence whatsoever that Agent Goldstein conducted any further search of the premises that exceeded the bounds of the plain view doctrine.

Because Alleyne consented to agents entering her home and because incriminating items were in plain view once they did so, Alleyne's motion to suppress is denied.

### C. Defendants' Motion to Exclude Expert Testimony on Money Laundering

By letter dated August 15, 2011, the Government notified the Defendants that it intends to introduce the expert testimony of Detective Sergeant Frank J. DiGregorio on the means and methods that drug traffickers use to launder money. (See Def. Letter re Expert (Docket Entry # 204) at 1; Gov't Opp. re Expert (Docket Entry # 215) at 4.) Sergeant DiGregorio is a retired New York Police Department Officer who is currently employed as a Sergeant with the Queens

County District Attorney.  (See Gov't Opp. re Expert, Exh. A (DiGregorio Resume).)  In this capacity, and as a member of an interagency task force, Sergeant DiGregorio's "primary function is to investigate money laundering."[6]  (Id.)  Sergeant DiGregorio has been qualified as an expert witness in state and federal court approximately ten times in the past several years, including in the Eastern and Southern Districts of New York.  (Id.; Gov't Opp. re Expert at 4.)

Defendants filed a motion in limine seeking to exclude Sergeant DiGregorio's expert testimony on money laundering, under Federal Rules of Evidence 702 and 403.  (Def. Letter re Expert.)  The Government opposes this motion.  (Gov't Opp. re Expert.)

       1.    <u>Rule 702</u>

Federal Rule of Evidence 702 governs expert testimony.  The Rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Defendants suggest that Sergeant DiGregorio's proposed testimony should be excluded because it is not specialized knowledge that will assist the trier of fact.  (Def. Letter re Expert at 2 (arguing that "it is not at all apparent that jurors require . . . expert 'assistance' in order to evaluate the evidence" of money laundering or structuring.)

The court disagrees.  The Government must prove the money laundering and structuring charges at trial, and it states that Sergeant DiGregorio would provide testimony on topics including "the means and methods used by drug traffickers to launder drug proceeds"; the means through which "drug proceeds are hidden" including "trade-based money laundering, that other individuals are used as straw purchasers of property and holders of assets and that cash is used to

---

[6]  Sergeant DiGregorio's investigation focuses primarily on the Colombian Black Market Peso Exchange.  (Id.)

pay for goods and services in a manner designed to avoid use of the banking system"; and "the use of structuring as a means to avoid transaction reporting requirements."  (Gov't Opp. re Expert at 4-5.)  Methods of money laundering and structuring are not self-evident to a layperson, and the court finds that expert testimony on these topics would be helpful to jurors in this case.

Additionally, courts in this circuit have repeatedly approved of the use of expert testimony to assist jurors in understanding money laundering techniques, including in the context of drug trafficking organizations.  See, e.g., United States v. Tapia-Ortiz, 23 F.3d 738, 740-41 (2d Cir. 1994) (approving use of expert testimony on drug trafficking, including the use of cash and means of accounting in order to conceal profits); United States v. Daccarett, 6 F.3d 37, 58 (2d Cir. 1993) (approving DEA agent's provision of expert testimony on money laundering); United States v. All Funds on Deposit in Any Accounts Maintained at Merrill Lynch, Pierce, Fenner & Smith, 801 F. Supp. 984, 997 (E.D.N.Y. 1994) ("Sophisticated drug money-laundering activities, such as those relied upon by claimants, are a proper subject for expert testimony.  The methods of moving of currency internationally and the maintaining of corporate and bank records are not subjects easily understood without some expert assistance.").  Therefore, the court finds that Sergeant DiGregorio's proposed expert testimony relates to scientific, technical or other specialized knowledge that will assist the jury in this case, and should not be excluded pursuant to Rule 702.

    3.    Rule 403

Defendants further argue that even if the Government has identified a proper area of expert testimony under Rule 702, Sergeant DiGregorio's proposed testimony should be excluded because it is more prejudicial than probative, and would work only to bolster the Government's case.  Federal Rule of Evidence 403 provides that even relevant evidence "may be excluded if its

probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403; see also Part III(A)(1)(c) infra. Here, the probative value of Seargeant DiGregorio's testimony—which will elucidate subjects that would be difficult to understand without expert assistance—has probative value sufficient to outweigh danger of unfair prejudice. The Government will not use Sergeant DiGregorio as a fact witness or ask him to testify about the facts of this case (Gov't Opp. re Expert at 8), and any danger of prejudice is minimal. The court finds that this expert testimony should not be excluded under Rule 403. Defendants' motion is therefore denied.

### D. Bourne's Motions Regarding Wiretap Evidence

From January to March 2006, the Government obtained five judicial orders authorizing wiretaps of telephones registered to Bourne's alleged coconspirators. (Gov't Mem. Opp. Bourne (Docket Entry # 187) Exh. A, B, C, D, E.) Each of these orders was issued by The Honorable John Gleeson of the United States District Court for the Eastern District of New York. (Id.) Three of these orders, issued in January, February and March 2006, authorized wiretaps of a telephone registered to Oneal Roberts, based on affidavits signed by Special Agent Jason Mount of the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"). (Gov't Mem. Opp. Bourne Exh. A, B, C; Gov't Mem. Opp. Bourne at 3-4.) Two orders, issued in March and April 2006, authorized wiretaps of a telephone registered to Clive Beckford, based on affidavits signed by Special Agent Heather Shand of ICE. (Gov't Mem. Opp. Bourne Exh. D, E; Gov't Mem. Opp. Bourne at 3-4.) During the period that these five wiretaps were active, Bourne was recorded on calls to and from the subject telephones. (Bourne Mem. at 7; Gov't Mem. Opp. Bourne at 3-4.)

Bourne has filed two motions related to these recordings. First, Bourne filed a motion to compel the Government to allow his expert to inspect the wiretap equipment and original recordings in order to determine whether there are signs of tempering or other flaws in the recordings that would undermine their admissibility. (Bourne Mot. to Compel (Docket Entry # 172) at 1; see also Bourne Compel Letter (Docket Entry # 181).) Second, Bourne moves to suppress the wiretap evidence. (Bourne Mem. at 7-9.)

   1. Motion to Compel Discovery

The Government has provided Bourne with a CD containing copies of the wiretaps at issue. (See Bourne Compel Letter at 1.) Bourne contends that his expert's inspection of these copies raised "certain questions . . . as to the integrity of the embedded computer information." (Id.) Consequently, Bourne moved to compel the Government to allow his expert to inspect the original tapes and wiretap equipment in order to determine whether "the government has tampered with the wiretap evidence and has fabricated telephone records." (Id.)

The Government has agreed to allow Bourne's expert to inspect the original recordings in the Government's presence. (Gov't Opp. to Wiretap Discovery (Docket Entry # 182) at 1; see also Suppression Hearing Tr. 116-17.) Thus, Bourne's request for access to the original recordings is now denied as moot.

With regard to any additional testing or inspection of the recording equipment, Bourne's motion is denied. Bourne has offered no evidence tending to show that further inspection will expose evidence of tampering and is thus material to preparing Bourne's defense. See Fed. R. Crim. Pro. 16(a)(1)(E). In the absence of such evidence, any further inspection of the audio recordings or the equipment used to make them is unwarranted. See United States v. Terry, 702 F.2d 299, 312-13 (2d Cir. 1983) (after defendant was provided with copies of tapes and offered

the opportunity to have his expert examine originals in the Government's presence, denying further access to original recordings "[i]n the absence of any plausible evidence indicating an alteration or distortion of what was recorded on the tapes and in light of the trial court's finding of authenticity and accuracy"); United States v. Fuentes, 563 F.2d 527, 532-33 (2d Cir. 1977) (rejecting defendant's objection to the admission of an audio recording where there had been no expert examination confirming evidence of tampering and defendant's objection was based on speculation).  Although the court will not compel any further discovery on this issue based on Bourne's speculation alone, if the initial expert inspection of the original recordings uncovers evidence that may be relevant to this issue, Bourne may file a new motion.

### 2.    Motion to Suppress Wiretap Evidence

Bourne moves to suppress evidence gathered through the court-authorized wiretaps of Roberts's and Beckford's telephones, on two grounds.  (Bourne Mem. at 3.)  First, Bourne argues the Government's wiretap applications failed to establish probable cause because they were not based on reliable and complete information.  (Id. at 19-26.)  Second, Bourne argues that the Government failed to establish that a wiretap order was necessary because other investigative techniques were likely to fail.  (Id. at 26-33.)  The Government opposes this motion.  (Gov't Mem. Opp. Bourne)

Wiretap authorizations are governed by 18 U.S.C. § 2518.

[A] federal court may issue a wiretap order under 18 U.S.C. § 2518 if it determines, on the basis of the facts submitted by the applicant, that there is probable cause to believe (1) that an individual was committing, had committed, or is about to commit a crime; (2) that communications concerning that crime will be obtained through the wiretap; and (3) that the premises to be wiretapped were being used for criminal purposes or are about to be used or owned by the target of the wiretap.

United States v. Diaz, 176 F.3d 52, 110 (2d Cir. 1999). The existence of probable cause is determined based on the totality of the circumstances. Id. (citing Illinois v. Gates, 462 U.S. 213, 230-32 (1983)).

In addition to its probable cause requirements, § 2518 requires a wiretap applicant to submit a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(1)(c), and requires the authorizing judicial officer to determine that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(3)(c). This requirement is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Kahn, 415 U.S. 143, 153 n.12 (1974). Nonetheless, the Second Circuit has held that "the purpose of the statutory requirements is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather, they only require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." United States v. Torres, 901 F.2d 205, 231 (2d Cir. 1990) (noting that "the apprehension of so-called 'satellites' involved in the distribution scheme and the determination of the dimensions of an extensive drug conspiracy have been held to justify the use of electronic surveillance").

In authorizing these wiretaps, Judge Gleeson found that all five of the Government's applications complied with these requirements. And, in considering Bourne's motion to suppress, the court affords deference to the issuing court.

Where a defendant moves to suppress evidence obtained pursuant to a judicially authorized wiretap on the grounds that the wiretap application was not supported by facts sufficient to establish probable cause, or on the grounds that the Government failed to establish that traditional investigative techniques were reasonably likely to be unsuccessful, the trial court reviews the wiretap application only to determine whether the facts set forth by the Government were "minimally adequate" to support the issuing court's order.  United States v. Concepcion, 579 F.3d 214, 217 (2d Cir. 2009) (holding that trial judge who suppressed evidence obtained under wiretap authorization issued by different district judge failed to accord sufficient deference to the issuing judge's determination to issue the wiretap authorization).  A court reviewing a wiretap authorization issued by another court must accord "considerable deference to the district court's decision whether to allow a wiretap, ensuring only that 'the facts set forth in the application were minimally adequate to support the determination that was made,'" Id. (quoting United States v. Miller, 116 F.3d 641, 663 (2d Cir. 1997)); see also United States v. Wagner, 989 F.2d 69, 72 (2d Cir. 1993) ("The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause.").

In accordance with this standard, the court must give Judge Gleeson's determination as to the sufficiency of the wiretap applications considerable deference.  The court finds that the information in the Government's wiretap applications was at least "minimally adequate" to support Judge Gleeson's determination that the requirements of § 2518 were satisfied.  Bourne's motion to suppress the wiretap recordings is therefore denied.

### E.    Bourne's Pro Se Motions

By letter to the court, Bourne submitted a series of pro se motions in addition to those filed by his attorney.[7]  At the pretrial motions hearing on August 26, 2011, the court provided Bourne's counsel with these submissions and instructed that all motions should be made through counsel.  (Pretrial Mot. Hearing Tr. at 20-21.)  Defense counsel compiled Bourne's pro se motions and filed them along with a letter summarizing and emphasizing several of Bourne's arguments.  (Bourne Letter re Pro Se Mot. (Docket Entry # 208).)

The court has reviewed defense counsel's letter and all of Bourne's pro se letters attached thereto.  Several of Bourne's pro se motions supplement the motions made through counsel regarding wiretap evidence.  (Bourne Letter re Pro Se Mot. at 1-2, Exh. C, D, F.)  The court has addressed this issue in Part II.D *supra*, and any additional requests made in Bourne's pro se motions regarding the wiretap recordings are denied.  Bourne's pro forma motion for discovery in connection with a GPS tracking (id. Exh. A) device is also denied.  The response of the Government satisfies the court that there is no basis for the relief sought.[8]  Finally, with regard to Bourne's argument in several of his letters that the Government "has presented false evidence" with regard to telephone records involving Oneal Roberts and Clive Beckford, the Government has filed a voluminous response, including significant supporting documentation, which the court finds sufficient to refute the "false evidence" claims.  (Gov't Opp. to Pro Se Mot. (Docket Entry # 229).)  The court has considered Bourne's additional pro se motions not specifically addressed here and finds them meritless.  These motions are also denied.

---

[7]       Bourne's pro se motions are not docketed or filed on ECF individually.

[8]       Defense counsel does not contest the Government's representation that "no evidence was developed as a result" of the device, but asserts Bourne's motion "in order to preserve Mr. Bourne's rights should information develop at trial that contradicts the Government's position."  (Bourne Letter re Pro Se Mot. at 1.)  Defendant is free to make a motion through counsel at the appropriate time if any such information develops.

The court reiterates that any future communications that Bourne directs at the court must be made through counsel, unless the purpose of the communication is to express concern about the counsel's effectiveness in representation.

## III. GOVERNMENT'S PRETRIAL MOTIONS

### A. Motion to Admit Evidence of Bourne's Other Acts

The Government moves to admit evidence of several acts allegedly committed by Bourne, but not charged in the S-5 Indictment. Specifically, the Government seeks to introduce evidence of "(1) three large-scale shipments of marijuana from Jamaica to Barbados coordinated by Bourne between 2007 and 2009; (2) one attempted shipment of cocaine; (3) Bourne's assault of Aaron Grieves in 2004; (4) Bourne's request of a cooperating witness to purchase a handgun and his possession of a handgun on three occasions[;] and (5) the disappearance of a member of Bourne's organization in Barbados in 2008." (Gov't 404(b) Mot. (Docket Entry # 205) at 1.) The Government argues that evidence of these acts is admissible as direct evidence of the charged crimes and, additionally, that this evidence is admissible under 404(b). (Id.; Gov't 404(b) Reply (Docket Entry # 226).) Bourne opposes the motion. (Bourne 404(b) Opp. (Docket Entry # 213).)

#### 1. Applicable Law

##### a. Permissible Purposes of Uncharged Crime Evidence

Evidence of uncharged acts may be admissible, subject to the limitations imposed by Rules 403 and 401 discussed *infra*, on either of two possible bases.

###### i. Non-404(b) Purposes

Evidence of uncharged acts is admissible, outside of the strictures of Rule 404(b), as direct evidence of the charged crimes, where such acts "arose out of the same transaction or

series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." See United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000). Accordingly, in conspiracy cases, any act "that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged." United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999) (internal quotation marks and alterations omitted); see also United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994) ("When the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself.").

ii.     Admissibility Under Rule 404(b)

Evidence of uncharged crimes may also be admissible under Federal Rule of Evidence 404(b):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

Fed. R. Evid. 404(b). The Second Circuit has adopted an "inclusive" approach to Rule 404(b) evidence. United States v. Stevens, 83 F.3d 60, 68 (2d Cir. 1998). Accordingly, evidence of other acts may be admitted for "any purpose except to show criminal propensity," subject to the limitations of Rule 403. United States v. Germosen, 139 F.3d 120, 127 (2d Cir. 1998) (internal citation and quotation marks omitted). Rule 404(b)'s list of permissible purposes for the admission of other act evidence is "nonexhaustive." United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984).[9]

---

[9]     Before other act evidence may be admitted under Rule 404(b), the court must consider whether it is offered for a proper purpose, whether it is relevant to a disputed issue, and whether its probative value is substantially outweighed by its possible prejudicial effect. See United States v. Edwards, 342 F.3d 168, 176 (2d Cir. 2003). Furthermore, if such evidence is admitted, the court must administer an appropriate limiting instruction if one is requested. See id.; United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992).

Among other reasons, other acts evidence may be admissible under Rule 404(b) to "complete the story of the crimes charged," to "help explain to the jury how the illegal relationship between the participants in the crime developed," United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000), or to explain "the mutual trust that existed between coconspirators," United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993). Other acts evidence is also admissible to corroborate other testimony, to the extent the Government demonstrates that "the corroboration is direct and the matter corroborated is significant." United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987).

    b.  <u>Rule 403</u>

Even if evidence is relevant and potentially admissible for one of the foregoing purposes, the court must also consider its admissibility under Federal Rule of Evidence 403. Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180 (1997). Evidence is considered prejudicial if it tends "unfairly to excite emotions against the defendant." United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980). Accordingly, evidence that is more "inflammatory," "sensational," or "disturbing" than the conduct charged is likely to be found unfairly prejudicial. United States v. Mercado, 573 F.3d 138, 145 (2d Cir. 2009); United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir. 1992); see also United States v. Williams, 585 F.3d 703, 708 (2d Cir. 2009) (the Government should not be permitted to introduce into

evidence "unsavory details which go beyond what is necessary to make the point"). In conducting the required Rule 403 balancing, the court should consider whether any evidentiary alternatives exist, which are similarly probative but less prejudicial to the defendant. <u>Old Chief</u>, 519 U.S. at 182-83; <u>see also</u> <u>United States v. McCallum</u>, 584 F.3d 471, 477 (2d Cir. 2009). The court must also take into account, however, "the offering party's need for evidentiary richness and narrative integrity in presenting a case," <u>Old Chief</u>, 519 U.S. at 183.

c.     <u>Relevance</u>

For other acts evidence to be considered relevant under Federal Rule of Evidence 401, the Government must show that a jury could "'reasonably conclude that the act occurred and that the defendant was the actor.'" <u>United States v. Gilan</u>, 967 F.2d 776, 780 (2d Cir. 1992) (quoting <u>Huddleston v. United States</u>, 485 U.S. 681, 689 (1988)). This standard does not require the Government to prove Bourne's involvement in the alleged other acts by a preponderance of the evidence. <u>Huddleston</u>, 485 U.S. at 690. Nonetheless, the court must determine whether the jury "could reasonably find" such involvement by a preponderance of the evidence. <u>Id.</u> Therefore, in this pretrial stage, the court requires at least some proof that an act was committed and that Bourne had a role in that act.

2.     <u>Application</u>

a.     <u>Bourne's Request for Mini-Hearings</u>

As an initial matter, in his opposition to the Government's motion to admit the foregoing evidence, Bourne requests that the court "conduct *in limine* hearings . . . in order to assess the relevance of such evidence and to conduct the requisite balancing test pursuant to Federal Rules of Evidence 404(b) and 403." (Bourne 404(b) Opp. at 1, 6-7.) The Government's proffers and the other information contained in the parties' briefs provided the court with a sufficient basis to

find the above information relevant under Rule 401 and make admissibility determinations as stated below. Bourne's motion for in limine hearings on this issue is therefore denied.

b. <u>Shipments of marijuana and cocaine</u>

The Government seeks to introduce evidence of three large-scale shipments of marijuana and one shipment of cocaine. (Gov't 404(b) Mot.; Gov't 404(b) Reply.) The Government proffers that it expects a cooperating witness, who had been involved with the Bourne organization's marijuana trafficking since 2006, to testify that in or about April 2009, Bourne "began arrangements for a large-scale shipment of approximately 30 to 50 kilograms of cocaine to be shipped from Trinidad" to New Jersey in a cargo container and instructed the cooperating witness to take actions in furtherance of this scheme. (Gov't 404(b) Reply at 2-3.) The Government also states that it expect to elicit evidence, including testimony from a cooperating witness, that Bourne, who was in the Eastern District of New York, arranged for several large-scale shipments of marijuana between Jamaica and Barbados. (Id. at 3.) It proffers that "[i]n the course of at least one such transaction, Bourne shipped marijuana in a container" from his business in Brooklyn to his business in Barbados. (Id.)

Evidence of these alleged drug shipments is admissible outside of the strictures of Rule 404(b) because they are part of the charged conduct. Count One of the S-5 Indictment charges Bourne with continuing criminal enterprise, including violations that encompass these transactions.[10] (S-5 Indictment ¶¶ 16 (Violation One: Conspiracy to Import Cocaine), 20 (Violation Five: International Marijuana Conspiracy).) Furthermore, even if these alleged drug shipments were "uncharged," they are "inextricably intertwined" with the charged conduct and would be admissible on that basis. The probative value of this evidence far outweighs any

---

[10]     These violations are also charged as separate counts in the indictment. (S-5 Indictment ¶¶ 29, 37.)

potential risk of prejudice, as these allegations are no more serious or inflammatory than the other charged conduct.  See United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000).

c. Uncharged weapons crimes

The Government also seeks to introduce testimony of two cooperating witnesses to show that Bourne engaged in a series of uncharged acts involving weapons.  (Gov't 404(b) Mot. at 4.)  The Government proffers that cooperating witnesses will testify that they observed Bourne carrying a weapon, once in 2003 and once in 2008, "for protection" in connection with his drug business.  (Id.)  One cooperating witness is further expected to testify that Bourne asked him to purchase an additional weapon for him after members of the marijuana DTO were robbed, and that on a separate occasion Bourne expressed interest in getting a weapon in order to retaliate after an individual shot at him and the cooperating witness.  (Id.)

The Second Circuit has "repeatedly approved the admission of firearms as evidence of narcotics conspiracies, because drug dealers commonly keep firearms on their premises as tools of the trade."  United States v. Becerra, 97 F.3d 669, 671-72 (2d Cir. 1996) (quoting United States v. Vegas, 27 F.3d 773, 778 (2d Cir. 1994).  Here, these alleged actions involving weapons were taken in furtherance of the continuing criminal enterprise, and are admissible as evidence of the charged conduct.  Furthermore, these acts are admissible as "tools of the trade" proof of the narcotics conspiracy, as proof of the relationships of trust between Bourne and his coconspirators, and to complete the story of the crimes charged.  Far from "sensational" or "disturbing," testimony that an alleged leader of an international drug trafficking organization possessed or wanted to possess a firearm on several occasions should come as no surprise to juror, and the court finds that such evidence will not unfairly prejudice the Defendant.  The

probative value outweighs any risk of prejudice, and the Government may introduce evidence of this conduct.

>    d.    <u>Uncharged crimes of violence</u>

>        i.    <u>Assault of Aaron Grieves</u>

The Government also proffers that a cooperating witness "is expected to testify that in 2004, Bourne physically assaulted a fellow American Airlines employee, Aaron Greaves, because Bourne accused Greaves of stealing two kilograms of cocaine from him.  This act of violence forced Greaves to pay Bourne for the missing cocaine."  (Gov't 404(b) Mot. at 3.)

Although the S-5 Indictment references threats and violence allegedly made by Bourne and other members of the Bourne Organization (<u>see</u> S-5 Indictment ¶ 8),[11] it does not charge Bourne with any crime of violence.  Nonetheless, evidence about the Grieves incident is admissible for non-404(b) purposes.  The alleged assault on Grieves, while serious, is no more inflammatory than the charged conduct, including running a large-scale drug trafficking organization.  The assault was done in furtherance of the continuing criminal enterprise, indicates Bourne's leadership role and his participation, and is inextricably tied to the charged conduct.  Although there is some risk of prejudice, the high probative value of this testimony outweighs it.  Additionally, "it is not unreasonable to infer that jurors might infer the existence of at least some violence" in a large-scale international DTO alleged to have operated for some nine years.  <u>See</u> <u>United States v. Khan</u>, 591 F. Supp. 2d 202, 206 (E.D.N.Y. 2008).  Evidence of the alleged assault on Aaron Grieves is therefore admissible.

---

[11]    As background information, in describing the alleged Bourne Organization scheme, the indictment states: "Members of the BOURNE Organization, including VICTOR D'ACOSTA BOURNE, employed threats and the actual use of violence in order to maintain  discipline and deter members of the organization from cooperating with law enforcement."  (S-5 Indictment ¶ 8.)

ii.    Missing Person in Barbados

Finally, the Government seeks to introduce testimony of a cooperating witness about the disappearance of a member of the Bourne Organization in Barbados. (Gov't 404(b) Mot. at 4.) The witness is expected to testify that Bourne took credit for this individual's disappearance, stating that "because the individual had stolen 150 pounds of marijuana from [Bourne], he 'wasn't coming back' because [Bourne] 'had taken care of him.'"

The court need not address the admissibility of testimony about this incident under 404 or otherwise, because Rule 403 precludes its admission. The cooperating witness's testimony strongly implies Bourne's involvement in murder, a crime that is more serious than those charged. Admission of this testimony would be highly inflammatory and unfairly prejudicial. To the extent that this evidence would be probative of Bourne's leadership role and methods of enforcing control over the Bourne organization, testimony regarding the assault on Aaron Grieves (which also allegedly occurred in retaliation for stealing drugs from Bourne) provides a less prejudicial evidentiary alternative. See United States v. McCallum, 584 F.3d 471, 477 (2d Cir. 2009) ("'[T]he availability of other, less prejudicial, evidence on the same point ordinarily reduces the probative value of a given item of extrinsic evidence.'") (quoting 2 Weinstein, Federal Evidence § 404.21 (Joseph M. McLaughlin ed., Mathew Bender & Co. 2009)). Even taking the Government's need for evidentiary richness into account, the risk of undue prejudice outweighs the probative value of this evidence. See United States v. Khan, 591 F. Supp. 2d at 206 (excluding evidence of uncharged murder where defendant was "not charged with any crimes of violence, intimidation, or firearms" under Rule 403). The Government is therefore precluded from admitting evidence of Bourne's alleged involvement in the disappearance of this individual in Barbados.

**B.** **Motion to Admit Bourne's Statements**

In its case against both Defendants, the Government seeks to rely on statements that Bourne allegedly made in (1) two letters written to Alleyne from prison, and (2) conversation with a cooperating coconspirator during the course of the conspiracy. (Gov't Mot. in Limine (Docket Entry # 219) at 1-9.) Defendants have submitted separate responses in opposition to the Government's motion. (Alleyne Opp. to Motion in Limine (Docket Entry # 230); Bourne Opp. to Mot. in Limine (Docket Entry # 231).)

1.     Bourne's Letters to Alleyne

During the October 14, 2011 search of Alleyne's residence, agents recovered two handwritten letters that the Government contends Bourne wrote to Alleyne from prison, following his arrest.[12] (Gov't Mot. in Limine at 1-2, 4; see Gov't Mot. in Limine Exh. A, B (handwritten letters).) The Government seeks to introduce excerpted portions of these letters in order to show that Bourne was directing Alleyne as to the movement of assets including several commercial properties. The Government states that these portions of the letters are "admissible as Bourne's inculpatory statements concerning the crimes charged and as statements in furtherance of the money laundering conspiracy between Bourne and Alleyne." (Id. at 4.) The Government, however, argues that the court should preclude the introduction of other portions of these letters, in which Bourne makes arguably exculpatory statements. (Id. at 6.)

Alleyne argues that there is no basis for the introduction of these letters against her; and both Defendants argue that, if any part of the letters is admitted, they should be admitted in their entirety, not in excepted form, in the interest of fairness and completion. (Alleyne Opp. to Motion in Limine at 1-2; Bourne Opp. to Mot. in Limine at 3-4.) Additionally, Bourne correctly

---

[12]     At the time the letters were written, neither Bourne or Alleyne had yet been indicted on money laundering charges. (See Gov't Mot. in Limine at 5.)

contends that the Government must authenticate the letters prior to their introduction. (Bourne Opp. to Mot. in Limine at 1-4.)

Assuming that the Government can meets its burden under Federal Rule of Evidence 901 and properly authenticate the letters at trial, the court finds that they are admissible against Bourne, pursuant to Rule 801(d)(2)(A), and against Alleyne, pursuant to Rule 801(d)(2)(E). Fed. R. Evid. 801, 901. Defendants' remaining arguments about the reliability of the content of letters goes to the weight of the evidence, not its admissibility. Consistent with Rule 106, however, the letters must be introduced in their entirety, not in excerpted form. Fed. R. Evid. 106. The portions the Government seeks to omit will serve to place the other statements "in context, to avoid misleading the jury, [and] to ensure fair and impartial understanding of the admitted portions." United States v. Jackson, 180 F.3d 55, 73 (2d Cir. 1999) (citations and quotations omitted). If the Government chooses to introduce Bourne's letters to Alleyne, both parties will be free to argue to the jury as to the reliability the letters or specific portions thereof.

### 2. Bourne's Statements to the Cooperating Witness

The Government also seeks to rely on the testimony of a cooperating witness, who allegedly participated in laundering the profits of the Bourne Organization's marijuana trafficking scheme. (Gov't Mot. in Limine at 1-2, 7.) The witness is expected to testify that, during the course of the conspiracy, Bourne made statements about his drug trafficking and methods of hiding the profits of his illegal activities. (Id. at 7.) Among other things, the witness is expected to testify that Bourne told him that he hid his ownership of commercial properties by listing these properties in Alleyne's name. (Id.) Alleyne opposes introduction of testimony recounting statements that implicate her, arguing inter alia that the statements of a cooperating witness are unreliable hearsay that raise Confrontation Clause problems. (Alleyne Opp. to

Motion in Limine at 3-4.) Bourne has not submitted any objection to this aspect of the Government's motion.

The court finds that this cooperating witness's proffered testimony about Bourne's statements made during the course of the alleged conspiracy are admissible against Bourne, pursuant to Rule 801(d)(2)(A), and against Alleyne, pursuant to Rule 801(d)(2)(E). Fed. R. Evid. 801. Admission of this testimony against Alleyne does not raise a Confrontation Clause problem. Bourne's statements to the cooperating witness were made during the course of the conspiracy, not in a custodial or post-arrest context. See United States v. DeVillio, 983 F.2d 1185, 1193-94 (2d Cir. 1993) (no Bruton violation where "the statements at issue fall within the purview of Rule 801(d)(2)(E) and were admissible as statements made 'in furtherance of' the conspiracy"); United States v. Nouri, 07-CR-1029 (DC), 2009 WL 1726229, at *1 (S.D.N.Y. June 17, 2009) (collecting additional cases and noting that this principle is unaffected by Crawford v. Washington, 541 U.S. 36 (2004)). Moreover, "the Confrontation Clause simply has no application" where, as here, hearsay statements are non-testimonial.[13] United States v. Williams, 506 F.3d 151, 156 (2d Cir. 2007) (affirming the admission of non-testimonial co-defendant statements) (quotations and citations omitted).

Alleyne's additional arguments as to the cooperating witness's reliability and her suggestions that his testimony may be "bias[ed]" or tailored to "curry favor with the Government" (Alleyne Opp. to Motion in Limine at 3), go to the weight of his testimony, not its admissibility. These issues may be properly addressed on cross-examination or in counsel's arguments to the jury.

---

[13]     Alleyne does not, nor could she, argue that the statements at issue are testimonial. (See Alleyne Opp. to Motion in Limine at 2.); see also United States v. Williams, 506 F.3d at 157.

**C.     Motion to Preclude Defense from Questioning Government's Motives**

The Government moves to preclude Alleyne from making "arguments concerning the government's motivation for prosecuting her and the timing of her prosecution."  (Gov't Mot. in Limine at 9-10.)  On May 23, 2010, prior to Alleyne's arrest but after Bourne's, she was stopped by a Customs Border Protection officer at JFK airport.  (<u>Id.</u>)  The officer recovered a number of items from Alleyne's luggage and her person, including photographs of two Assistant United States Attorneys assigned to this case, the names of several of federal judges, the names of several cooperating witnesses, and an inmate identification card for an inmate incarcerated with Bourne.  (<u>Id.</u>)  Alleyne later stated that she had traveled to Africa to have a man put a "hex" on the Assistant United States Attorneys.  (<u>Id.</u> at 10-11.)  The Government seeks to preclude any argument that the subsequent prosecution of Alleyne was vindictive or in retaliation for her "hex" activities.  (<u>Id.</u> at 11.)

Alleyne states that she has no intention of making any argument that the Government's prosecution is retaliatory.  (Alleyne Opp. to Motion in Limine at 4.)  The Government states that it does not intend to admit evidence related to the JFK stop or Alleyne's "hex" activities in its case in chief, "but reserves the right to use this evidence on cross-examination or in a rebuttal case."  (Gov't Mot. in Limine at 11 n.5.)  Given the inflammatory nature of this information, no party shall elicit testimony or admit other evidence on this issue at trial without the court's prior authorization.  If the Government believes that defense counsel has opened the door to this line of questioning, it shall make an application to the court outside of the presence of the jury, prior to any mention of the alleged "hex" or related information.

## IV.    CONCLUSION

As set forth above, the court GRANTS in part and DENIES in part the Government's motions in limine, and the court GRANTS in part and DENIES in part Defendants' pretrial motions.  To the extent that the court does not address arguments raised by Defendants in their submissions, the court has considered them and deems them to be either moot or without merit. SO ORDERED.

/s/ Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge

Dated: Brooklyn, New York
    September 23, 2011